UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

SUSAN B. LONG

and

DAVID BURNHAM,

                       Plaintiffs,

         -against-

UNITED STATES IMMIGRATION
AND CUSTOMS ENFORCEMENT,

                       Defendant.

Case No. 5:17-cv-00506-BKS-TWD

# DECLARATION OF SUSAN B. LONG

SUSAN B. LONG, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1. I am a statistician and the Co-Founder and Co-Director, with David Burnham, of the Transactional Records Access Clearinghouse ("TRAC") at Syracuse University ("Syracuse"). I am also one of the Plaintiffs in this case. I make this declaration in opposition to Defendant United States Immigration and Customs Enforcement's ("ICE") motion for summary judgment, and in support of Plaintiffs' cross-motion for summary judgment. I base this declaration on my personal knowledge and on my review of relevant documents, including materials generated in connection with Plaintiffs' Freedom of Information Act ("FOIA") requests at issue in this lawsuit.

2. I have a doctorate in Sociology from the University of Washington, with a dual major in Quantitative Methods and Criminology. After receiving my doctorate, I completed postdoctoral studies in Statistics at Princeton University. Early in my career, I was a Visiting Fellow at the National Institute of Justice, U.S. Department of Justice, a Visiting Scholar at the Bureau of Social Science Research, and a Visiting Scholar at the Center for Engineering Information at City University of London in England.

3. In addition to my position with TRAC, I am an Associate Professor of Managerial Statistics at Syracuse's Martin J. Whitman School of Management. I have been a faculty member since 1980, and have taught undergraduate, graduate, and doctoral seminars in statistics and research methods. From 1984-1992 I served as the Director of Syracuse's Center for Tax Studies. I have been the Co-Director of TRAC since its founding in 1989.

4. My Co-Director and Co-Plaintiff David Burnham is a longtime investigative journalist, and an Associate Research Professor at Syracuse's S.I. Newhouse School of Public Communications. Professor Burnham is based in Washington, D.C.

**Background on TRAC**

5. TRAC is a data gathering, data research, and data distribution center sponsored by the Whitman School of Management and the Newhouse School. Its main offices are in Syracuse, New York, and Washington, D.C. TRAC gathers, analyzes, and maintains a wealth of independent and nonpartisan information about staffing, spending and enforcement activities of the federal government. As a scholarly research organization, TRAC does not engage in advocacy. Nor does it take partisan positions of any kind. TRAC's purpose is to provide the American people – and institutions of oversight such as Congress, news organizations, public interest groups, businesses, scholars, and lawyers – with comprehensive and regularly updated information that allows for meaningful assessment of whether federal agencies are actually doing what agency officials claim to be doing, and whether these actions are achieving the agency's stated goals.

6. The U.S. Department of Homeland Security itself has cited TRAC's data, in its February 2017 implementing directive for the president's Executive Order on immigration enforcement. TRAC's website contains a quote from this document and a link to a copy of the full document at http://trac.syr.edu/tracatwork/detail/A2475.html.

7. Immigration enforcement records comprise a significant amount of the data that TRAC gathers, compiles, regularly updates, and makes available on its public website, http://trac.syr.edu/immigration. The two FOIA requests at issue seek information related to ICE's immigration enforcement actions and its interaction with other law enforcement agencies.

8. Both FOIA requests at issue sought information from ICE's Enforcement Integrated Database ("EID") concerning its Form I-247 requests. These relate to 1) Immigration Detainers

("Detainers") (the "Detainer Requests") and 2) Requests for Voluntary Notification of Release of Suspected Priority Alien ("Notices") (the "Notice Requests").

9. As ICE does not dispute, Detainers and Notices arise when ICE considers an immigrant who has been arrested by federal, state, or local law enforcement a potential priority for removal from the United States (i.e., deportation). Detainers are requests from ICE to federal, state, and local law enforcement agencies to maintain custody of an individual for up to 48 hours beyond when he or she would have otherwise been released. Notices are requests from ICE to law enforcement agencies for 48 hours advance notification of the pending release of an individual. ICE has used various versions of its Form I-247, including I-247, I-247D, I-247N, and I-247A. See ICE Answer (Dkt. No. 7) ¶¶8-11; Declaration of Marla Jones dated Nov. 8, 2017 (Dkt. No. 15-1) ("Jones Declaration" or "Jones Decl."), at ¶¶12-14.

**History of TRAC's Receiving Immigration Enforcement Data from ICE**

10. Professor Burnham and I began requesting database records documenting ICE enforcement activities under the Freedom of Information Act in 2006. Starting in 2011 as part of this research effort, TRAC began submitting FOIA requests for ICE database records concerning ICE's use of I-247 forms. To keep the data current, Professor Burnham and I have sought and received from ICE updated data related to Form I-247 requests by submitting new FOIA requests on a regular monthly cycle. Each monthly request sought records from a predetermined start date updated through the most recently completed month at the time of the request. For example, in June of 2017 we sought records from fiscal year (FY) 2015 through June 2017 and on August 1, 2017, we sought records from fiscal year (FY) 2015 through July 2017.

11. The data has allowed TRAC to create and provide online databases that allow the public to assess over time the focus and impact of the government's immigration enforcement

actions – both in their own communities and nationally. See, e.g., http://trac.syr.edu/phptools/immigration/detain. Visitors to this website page can sort and display data to show, for example, the number of Detainers issued by ICE from October 2002 through July 2017, and the number of Detainers issued by ICE on a state-by-state basis as well as by each recipient law enforcement agency within state counties.

12. Historically, TRAC has been able to present more particularized information from ICE concerning both Detainers and Notices. See, e.g., http://trac.syr.edu/phptools/immigration/detainhistory/. On this website page, visitors can sort data to show the number of Detainers ICE issued to particular facilities within a given state over time, and compare whether ICE assumed custody of subject individuals after it issued the Detainers. For instance, visitors to this website page can see that between 2007 and November 2015, ICE assumed custody of 47 out of the 110 individuals it requested be detained by the Onondaga County Jail in Onondaga County, New York. A true and correct copy of the website page displaying this data is attached as page 1 of **Exhibit ("Ex.") 1**. Visitors to the website page also can see that between October 2002 and November 2015, of the 71,454 Detainers issued by ICE to facilities in New York, nearly one third of these individuals (23,701) had no criminal conviction – and of that number, 10,657 individuals had no criminal record at all. A true and correct copy of website pages displaying this data is attached as pages 2-3 of Ex. 1. For those convicted, the public can examine what their most serious conviction was for, and also how many of these offenses ICE considered aggravated felonies or "Level 1" offenses – the agency's top priority for removal. The data reveal, for example, that nationally a total of 839,908 out of the 1,888,490 individuals had no conviction of any type, while when there was a conviction the most common was for "Driving Under Influence Liquor," and the third most frequent was for a simple "Traffic

Offense."  A true and correct copy of the website page displaying this data is attached as page 4 of Ex. 1.  As to the number of individuals convicted of an aggravated felony, in facilities in New York, the data reveal that slightly more than one-third (25,410 out of the total of 71,454) had been convicted of Level 1 offenses.  A true and correct copy of the website page displaying this data is attached as page 5 of Ex. 1.  Further, page visitors can see that ICE was confirmed to have issued Detainers for about one in ten – 1,001 of the 10,129 people – who were ultimately deported from New York between October 2012 and January 2016.  A true and correct copy of the website page http://trac.syr.edu/phptools/immigration/removehistory/ displaying this data is attached as page 6 of Ex. 1.

13. This data has allowed TRAC to publish many widely relied upon research reports.  In a report published in February 2013, for example, we reported that "no more than 14 percent of the 'detainers' issued by the government" during a sixteen-month period "met the agency's stated goal of targeting individuals who pose a serious threat to public safety or national security."  We further reported that roughly half "had no record of a criminal conviction, not even a minor traffic violation."  See TRAC's February 2013 report entitled, "Few ICE Detainers Target Serious Criminals," available at http://trac.syr.edu/immigration/reports/330/.

14. With the I-247 data we obtained through our monthly requests, we were able to monitor changes in immigration enforcement practices.  For example, we assessed then DHS Secretary Jeh Johnson's November 2014 reforms of ICE's I-247 program and found that "the two central features of [these] reforms … had little impact on the day-to-day actions of ICE field officers."  See TRAC's August 2016 report entitled, "Reforms of ICE Detainer Program Largely Ignored by Field Officers," available at  http://trac.syr.edu/immigration/reports/432/.

15. A companion TRAC report also published in August 2016 found that "the proportion of occasions where ICE took custody of the individual after issuing I-247 requests … had continued to decline. The end result is that ICE has not improved its performance through its detainer program in apprehending individuals who the agency seeks to deport." A copy of this report is available at http://trac.syr.edu/immigration/reports/433/. TRAC similarly found that relatively few deportations occurred following the issuance of ICE detainers during President Obama's administration. See "The Role of ICE Detainers Under Bush and Obama," available at http://trac.syr.edu/immigration/reports/458/.

16. The type of information in paragraphs 12-15 above is among the data that, starting abruptly in January 2017 in response to the first FOIA request at issue, ICE began refusing to disclose. Attached together as **Exhibit 2** are true and correct copies of TRAC website pages entitled "Latest Data: Immigration and Customs Enforcement Detainers" and "Latest Data: Immigration and Customs Enforcement Removals" that respectively display ICE as having withheld data on whether it assumed custody of subject individuals after it issued Detainers to the Onondaga County Jail (page 1); New York Detainer subject individuals' most serious criminal conviction and criminal history (page 2); and the number of people deported from New York for whom ICE had issued a Detainer (page 3).

**Plaintiffs' Detainer Requests**

17. On November 30, 2016, Plaintiffs submitted a FOIA request to ICE seeking anonymous data for fiscal year 2015 through November 2016 concerning ICE's Form I-247/I-247D, titled Immigration Detainer – Request for Involuntary Action (the "Detainer Requests"). Plaintiffs attached a true and correct copy of the Detainer Requests as Ex. A to their Complaint.

18. In a response dated January 10, 2017 received by Plaintiffs, ICE withheld large swaths of data from those forms, including data that had been disclosed in response to previous FOIA requests. Plaintiffs attached a true and correct copy of ICE's response to the Detainer Requests as Ex. B to their Complaint.

19. On March 14, 2017, Plaintiffs filed an appeal with ICE, requesting that the withheld records be released. Plaintiffs attached a true and correct copy of their appeal of ICE's Detainer Requests response as Ex. C to their Complaint.

20. In a response dated April 11, 2017 received by Plaintiffs, ICE denied Plaintiffs' appeal. Plaintiffs attached a true and correct copy of ICE's Detainer Requests appeal response as Ex. D to their Complaint.

**Plaintiffs' Notice Requests**

21. On November 30, 2016, Plaintiffs submitted a FOIA request to ICE seeking anonymous data for November 2016 concerning ICE's Form I-247N, titled Request for Voluntary Notification of Release of Suspected Priority Alien (the "Notice Requests"). Plaintiffs attached a true and correct copy of the Notice Requests as Ex. E to their Complaint.

22. In a response dated February 2, 2017 received by Plaintiffs, ICE withheld large swaths of data from the forms, including data that had been disclosed in response to previous FOIA requests. Plaintiffs attached a true and correct copy of ICE's Notice Requests response as Ex. F to their Complaint.

23. On March 14, 2017, Plaintiffs filed an appeal with ICE, requesting that the withheld records be released. Plaintiffs attached a true and correct copy of their appeal of ICE's Notice Requests response as Ex. G to their Complaint.

24. In a response dated April 11, 2017 received by Plaintiffs, ICE remanded to correct redaction markings in one field ("Eid Civ Pers ID"), but otherwise denied Plaintiffs' appeal. Plaintiffs attached a true and correct copy of ICE's Notice Requests appeal response as Ex. H to their Complaint.

**Other Litigation Against ICE**

25. Plaintiffs also have pending a FOIA action against ICE, commenced in 2014, in the U.S. District Court for the District of Columbia, with an index number of 1:14-cv-0109-APM (the "2014 D.C. Action"). Still pending before the court in that action is Plaintiffs' challenge to ICE's refusal to provide the names of fields and data elements in the EID.

26. Plaintiffs have a third pending FOIA action against ICE, commenced in 2017, in the U.S. District Court for the District of Columbia, with an index number of 1:17-cv-01097-APM (the "2017 D.C. Action"). This case involves data requests for information on ICE deportations of individuals as a result of its Secure Communities program. ICE contends that the issuance of ICE detainers in this program are central to its ability to apprehend and deport individuals from the country.

**The Disappearing Fields**

27. Plaintiffs' FOIA requests at issue in this case contain a numbered list of line items that were being requested. The declaration of Marla Jones filed by ICE in support of its motion for summary judgment discusses these as if each item corresponds to a single "data point," and then purports to count the number of "data points" ICE provided or did not provide. For example, in paragraph 20 of her declaration, Ms. Jones speaks of ICE having provided "72 data points." Jones Decl. ¶20. However, Exhibit 3 filed by ICE, which contains the actual data ICE

9

provided corresponding to these "72 data points," shows only 61 fields of data. See Dkt. No. 15-7 (physical CD exhibit).

28. This discrepancy in counts occurs because there is not a one-to-one relationship between a given line item in our requests and the corresponding database data elements or data points to which the line item corresponds. To illustrate: the "Prepare Date" in Exhibit 3 to Ms. Jones' declaration turns out to be responsive to BOTH line item #1 ("Date" Form I-247/I-247D or I-247N "was issued") and #96 from TRAC's request (Complaint Ex. A at 1, 5; Complaint Ex. E at 1, 4), while two fields – "State" and "City" in ICE's Exhibit 3 – are responsive to a single TRAC line item, #68 (Complaint Ex. A at 4; Complaint Ex. E at 3).

29. The end result is that a count of the number of line items in our requests is an unreliable guide to the number of actual database elements that ICE has released or withheld. Either could be higher, or lower, than the other for particular categories of requested items.

30. ICE has withheld information from dozens of data points that it used to produce as part of its responses to TRAC's previous, regular FOIA requests for this same Detainer and Notice information. I refer to these as "Disappearing Fields." Attached as **Exhibit 3** is a true and correct copy of a table itemizing the 40 disappearing fields from Plaintiffs' Detainer and Notice Requests. [1]

---

[1] Paragraph 28 in the Complaint indicated that there were 44 disappearing fields from ICE's response to the Detainer Requests. While this number was accurate, there were four fields that were provided in duplicate. ICE's previous releases had been separated into two separate linked data tables, and some fields were included in both data tables. These duplicated fields have been eliminated from the count in the Ex. 3 table. An additional four fields had been provided for detainers, but not for notices. Paragraph 32 in the Complaint indicated that there were 61 disappearing fields from ICE's response to the Notice Requests. While this number was accurate, there were a significant number of these fields where the entry for records pertaining to notices was always blank, or "NO" – indicating that for the overlapping period covered by the Detainer Requests and Notice Requests, no notices fell into these particular categories.

31. This change happened very abruptly. Indeed, in an Excel spreadsheet provided with ICE's response letter dated January 11, 2017 responding to another of TRAC's FOIA requests for data – concerning ICE detainers and requests for notification issued for FY 2015 through December 2015 – each of these Disappearing Fields was included. However, these fields were entirely missing from the Excel spreadsheet provided with ICE's response letter dated a day earlier – January 10, 2017 – responding to the Detainer Requests at issue here, for data concerning ICE detainers issued for FY 2015 through August 2016. This is despite the fact that the time periods covered in the two requests pertained to 15 identical overlapping months. Thus, there can be little question that all of these disappearing fields of data existed and were contained in ICE's EID database.

32. At the same time ICE ceased to provide these data fields or data points in response to our requests for records on Detainers and Notices, it continues to provide many of them in response to Plaintiffs' other monthly FOIA requests concerning ICE enforcement activities. For example, in response to Plaintiffs' FOIA requests at issue in the 2017 D.C. Action, ICE provided a number of the very same "Disappearing Fields" I have listed in the Exhibit 3 table. Request Items #8 and #9 – the first two entries in the table's right column – requested the date ICE administratively arrested an individual, and the date the individual was booked into ICE custody. Ex. 3 at 1; see also Complaint Ex. A at 1; Complaint Ex. E at 1. And in Item #35, we sought the "most serious criminal conviction offense." Ex. 3 at 2; Complaint Ex. A at 3; Complaint Ex. E at 2. While ICE withheld these fields from its responses to the requests at issue in this case, each of these data fields were provided by ICE in its original response to the FOIA requests at issue in

---

Therefore, given their limited information value and for simplicity, we have eliminated these fields from the count in the Ex. 3 table.

the 2017 D.C. Action. Attached as **Exhibit 4** is a true and correct extract from the spreadsheet data ICE released in that case. The column headings for data included in this extract include the "Arrest Date," "Book In Date," and "Most Serious Criminal Conviction." They also include "Most Serious Criminal Conviction Code," "Conviction Dt," and the sentence ("Sentence Years Qty," "Sentence Months Qty," "Sentence Days Qty") – fields that are identical to those requested in Items #36-#38 on the Disappearing Fields table in Ex. 3 (see page 2).

33. Only five days prior to its motion for summary judgment in this case, ICE filed a declaration from Ms. Jones in the 2017 D.C. Action. True and correct excerpts from Ms. Jones' 2017 D.C. Action declaration are attached as **Exhibit 5**. Her statements in paragraphs 41-42 of her D.C. declaration directly contradict her statements in this case. In her D.C. declaration, Ms. Jones states that a number of disappearing data fields "existed in the IIDS database … and did not require additional research, data interpretation, analysis, calculations, assumptions and/or other manipulation of the data." Ex. 5 at 2 (¶41). She similarly listed other disappearing fields as being provided in ICE's response to the requests at issue in that case because they existed in ICE's IIDS and did not require creating a new record. These included "date of departure" (corresponding to the "Departed Date" field in this case, see Ex. 3 at 1), "most serious charge code for latest removal" (corresponding to the "Initial Charge Description" field in this case, see Ex. 3 at 1), and "most serious charge section for latest removal" (corresponding to the "Initial Charge Section" field in this case, see Ex. 3 at 1). Ex. 5 at 2-3 (¶42).

34. Without knowledge of how ICE labels its data, TRAC has been forced to describe the information it seeks in its FOIA requests using TRAC's own terms. Nevertheless, in the past, ICE has repeatedly matched TRAC's requests from the Disappearing Fields at issue here with its own methods of labeling its data. See paragraph 31, *supra*.

**The Remaining Requested Data**

35. Outside of the Disappearing Fields, ICE contradicts itself when it claims that it does not maintain information responsive to Plaintiffs' remaining requests. For example, Ms. Jones states that the "IIDS does not contain one single identifier for the same 'alien' that would then be sequential in nature and carry across each Data Extract" in claiming that ICE does not maintain information responsive to Item #108 in the Detainer Requests: "Sequence number or other designation to identify records relating to the same alien." Jones Decl. ¶28; see Complaint Ex. A at 5. Yet ICE *did produce* precisely these kinds of sequence numbers in response to the request. See "Subject Id," "Eid Civ Pers Id," and "Eid Civ Id" in Ex. 3 to ICE's motion for summary judgment. (Dkt. No. 15-7).

36. Similarly, Ms. Jones states that ICE does not maintain information responsive to Item #42 for "aggravated felon (yes/no)." She states: "[t]here is no single data point in the system that marks a certain person as an aggravated felon." Jones Decl. ¶37; see also Complaint Ex. A at 3. Yet, again, ICE did produce precisely this field. See column "Aggravated Felony Yes No" at Ex. 4 to its motion for summary judgment (Dkt. No. 15-8).

37. ICE has previously produced other of the remaining requested data that it now claims does not exist:

    a) The Jones Declaration states that ICE does not maintain information responsive to Item #25 for "U.S. citizen spouse (yes/no)." Ms. Jones states: "there is no data set in any ICE system where ICE records the existence of a spouse, much less whether the spouse is a citizen." Jones Decl. ¶24; see Complaint Ex. A at 2; Complaint Ex. E at 2. Ms. Jones also similarly lists Item # 26 for "U.S. citizen parents (yes/no)" as not existing in ICE's databases. Jones Decl. ¶25; see Complaint Ex. A at 2; Complaint Ex. E at 2. However, in response to

13

previous FOIA requests ICE has provided exactly these data elements from its EID. For example, on April 5, 2012, ICE provided an Excel spreadsheet with data from its EID. The spreadsheet included a field called "Person Relationship," and within that field were many people identified either as "Spouse," "Father," or "Mother." The spreadsheet also contained a corresponding field called "Relative_Citizenship Country" which listed entries such as "MEXICO," "UNITED STATES," and "HONDURAS" that identified the citizenship of the spouse or parent. A true and correct copy of a relevant excerpt of that Excel spreadsheet, as submitted by me in the 2017 D.C. Action, is attached as **Exhibit 6**, and a true and correct copy of ICE's response letter forwarding this spreadsheet, as submitted by me in the 2017 D.C. Action, is attached as **Exhibit 7**.

        b)      The Jones Declaration similarly lists (at paragraph 25) Item #27 for "U.S. citizen child (yes/no)" as a field *not* existing in the EID. Plaintiffs also make regular monthly requests to Customs and Border Protection (CBP) to obtain immigration enforcement data. In response to these requests, we have been regularly provided with Excel spreadsheets containing data from the EID [2] that included a field called "NUMBER_CHILDREN_AND_NATIONALITY" which contained entries such as "5 MEXICO," "2/UNITED STATES," "1 USC," and "6, UNITED STATES CITIZENS." A true and correct copy of a relevant excerpt containing data points for FY 2017 through May reflecting "EID" data as of "7/12/17" is attached as **Exhibit 8**.

        c)      Regarding Item #55 "ICE Priority indicator(s): 1. ICE fugitive…, 2. Prior removal and return…, 3. Entered without inspection, 4. Overstayed visa," Ms. Jones

---

[2] CBP's responses note on the spreadsheets it provides that this data comes from the "EID." Ex. 8. ICE states it owns and operates the EID for its own use as well as that of certain other Department of Homeland Security components such as CBP. See Defendant's Statement of Undisputed Material Facts (Dkt. No. 15-4) at ¶26.

contends that the "data requested does not exist in the database as requested." Jones Decl. ¶27; see Complaint Ex. A at 3; Complaint Ex. E at 3. However, in the requests involved in the 2017 D.C. Action, we requested separate information items listing each of the same non-criminal ICE priorities. In response to this request, ICE provided a spreadsheet with a data field in the spreadsheet it provided that was labeled "Non-Criminal ICE Priorities." Values recorded in this field included whether the individual fell into the following categories: "Immigration Fugitives," "Repeat Immigration Violator" (that is, there had been a prior removal from and return to the United States), or was "EWI [entered without inspection], Visa Violator of Overstay." The response indicated the data were from the EID and covered the period FY 2015 through December 2015.

        d) Regarding a series of information items TRAC requested concerning detention facilities, Ms. Jones again states with respect to these that "the data cannot be provided as it does not exist in the database as requested." Jones Decl. ¶¶28-29. Professor Burnham and I have also made other FOIA requests for and have been provided with information by ICE about detention facilities, including about their "ownership (federal, state, local, private)" (Item #69-1) (Complaint Ex. A at 4); "type (prison, jail, hospital, other)" (Item #69-2) (*id.*; see also Complaint Ex. E at 3); "special characteristics (juvenile facility, family facility, etc.)" (Item #69-3) (Complaint Ex. A at 4, see also Complaint Ex. E at 3); "custody/license type' (Item #69-4) (Complaint Ex. A at 4); "operated by government vs private company and if private, name of private company" (Item #69-6) (Complaint Ex. A at 4; see also Complaint Ex. E at 3, Item #69-5); and "facility under government contract…to provide services" (Items #69-7 and #69-8) (Complaint Ex. A at 4; see also Complaint Ex. E at 3, Item #69-6 and #69-7). Using these data we have published numerous reports. For example, we used information about detention

facilities we had received from ICE in an April 2016 report that provides details on the type of facility, special characteristics such as whether these were a juvenile facility, whether these were operated under contract with the government, and the specific private company that operated such facilities.  See: http://trac.syr.edu/immigration/reports/422/.  TRAC provided the underlying detention facility-by-detention facility details via a public web query tool available at http://trac.syr.edu/immigration/detention/tran.shtml.

    e) With respect to Item #45 – "meets requirements if held for mandatory detention (yes/no)" (Complaint Ex. A at 3; Complaint Ex. E at 2) – and Item #46 – "Any and all information used in determining whether or not mandatory detention would be required if held" (Complaint Ex. A at 3; Complaint Ex. E at 2) – Ms. Jones again states that "the data cannot be provided as it does not exist in the database as requested."  Jones Decl. ¶¶26-27.  However, the agency often reports on the number of individuals in its custody held under mandatory detention.  For example, a report issued by the Office of Inspector General of the Department of Homeland Security (OIG-14-116 (Revised)), available at https://www.oig.dhs.gov/assets/Mgmt/2014/ OIG_14-116_Aug14.pdf, discusses mandatory detention, and provides specific data on "aliens with criminal convictions whose detention was statutorily required."  Page 6 of that report (p. 12 of the online PDF file) notes that "[d]ata is extracted using the ICE Integrated Decision Support System" (n. 9),  and states that ICE "publish[es] routine and customized reports that ICE shares with the DHS Secretary, the Office of Management and Budget (OMB) and congressional staff.  These reports may include the number of aliens in detention: whose detention is mandatory; who have criminal convictions; and who are non-criminal immigration violators."

**Further Contradictions by ICE**

38. Neither the information contained in the Disappearing Fields, nor any of the remaining information sought by TRAC and withheld by ICE in the Detainer and Notice Requests, required ICE to interpret or analyze its data, make calculations, or create entirely new records. First, as scholars, Professor Burnham and I prefer to conduct any required analyses ourselves, from original government records. Second, ICE has previously produced much of the information at issue, and continues to provide these items from its EID in response to other of our current monthly requests. Third, as discussed above, ICE has made admissions in the 2017 D.C. Action that contradict its statements here that a response "would require interpretations and assumptions because this field does not exist within IIDS." *See, e.g.*, Jones Decl. ¶26; see paragraph 33, *supra*.

39. Nor do the Detainer Requests or Notice Requests require ICE to answer questions that would require the creation of a new record. The numbered requests formatted in this pattern are not questions – indeed, none includes a question mark – and ICE has regularly understood and responded to these numbered requests with the fields and data elements in the EID that indicated the existence or nonexistence of the specified event or state of facts. Indeed, in the course of analyzing ICE's responses to Professor Burnham's and my previous FOIA requests, we had learned that ICE labeled many of its data fields as "Yes/No" to indicate the presence or absence of an event or other information.[3] In the requests at issue, TRAC therefore followed ICE's example in describing requests for data from ICE's "Yes/No" fields.

---

[3] ICE's own spreadsheets that it has submitted in support of its motion show that the agency maintains 35 data elements in a "Yes/No" format. See Dkt. Nos. 15-7 & 15-8. Such fields were sometimes used to record which checkbox was checked on an official ICE form giving the reason(s) for an enforcement action, or to record a particular category it used for management reporting purposes. The data elements in these fields might be recorded in the EID with "yes" or

17

40. Further, the requests at issue do not require assumptions, but rather, were framed by TRAC to *eliminate* implied assumptions. For example, Request #8 seeks this information: "Following the preparation of the Form I-247/I-247D[/I-247N], ICE administratively arrested individual (yes/no); if yes, date of ICE arrest." Complaint Ex. A at 2; Complaint Ex. E at 1. As noted above, ICE consistently provided information responsive in the past. See paragraphs 30-31, *supra* and Ex. 3, at 1. Moreover, the request plainly does not require, as ICE argues, that the agency "assume that an arrest following an issuance of a detainer was the result of a detainer." Jones Decl. ¶24. In fact, TRAC had framed its previous requests to ICE as whether an arrest had occurred "as a result" of a detainer or notice, but revised its wording after ICE responded that it did not have data regarding whether an arrest resulted from a detainer or notice, and instead provided the information regarding whether an arrest *followed* a detainer or notice.

41. Similarly, Request #9 seeks only information that is *temporally related* to a Detainer or Notice, and implies no cause-and-effect assumptions: "*Following* the preparation of the Form I-247N, individual was booked into ICE Custody (yes/no); and if yes: (a) date booked into ICE custody." Complaint Ex. A at 2; Complaint Ex. E at 1 (emphasis added). As with the arrest data discussed in the preceding paragraph, ICE had previously furnished this information on whether a Notice targeted individual had been booked into ICE custody.

42. To be sure there was no misunderstanding, in our appeal of ICE's responses to the Detainer Requests and Notice Requests, we stated that if ICE contends calculations are required, then ICE should provide the fields and data elements that ICE used for these calculations. Our appeals stated (Complaint Ex. C at 1; Complaint Ex. G at 1):

---

"no" entries, or "T" or "F" (for true or false), or yes would be indicated by a special code while the absence of any entry would signify a no. See Dkt. Nos. 15-7 & 15-8.

> If the agency believes that the information requested requires that a 'calculation or analysis' not required by FOIA be performed on other relevant information that is recorded, then this is actually an admission that additional responsive records exist and the agency's response must identify these additional responsive records and then either provide this additional information, or explicitly provide a legal basis for withholding it. Our request clearly extends to this additional information, and as you may be aware, as scholars we prefer to carry out any required analyses ourselves from the original information that is recorded in the agency's files.

We have also continued to submit requests for the disappearing fields on a monthly basis, and in these we also include this language. Despite the revised wording in these requests, ICE continues to respond in the same manner as the way it responded to the requests at issue in this case and has provided neither the Disappearing Fields nor any alternative responsive fields.

**Public Interest in the Information at Issue**

43. There is a heightened and immediate public interest in the information at issue, as shown by more than a hundred news, legal, and scholarly articles that were published in the first 100 days of the Trump administration citing to TRAC databases on immigration enforcement actions. Further, since the time Plaintiffs commenced this action on May 9, 2017, countless additional news, legal, and scholarly articles have cited to TRAC's immigration enforcement actions database. Links to some of these articles are available at http://trac.syr.edu/tracatwork/index.html, http://trac.syr.edu/tracatwork/index2.html, http://trac.syr.edu/tracatwork/index4.html, and http://trac.syr.edu/tracatwork/index5.html. Public interest has only increased. TRAC has also seen a steady stream of emails and calls to its offices from reporters, government officials, and community groups from around the country, seeking specific information on how detainer usage is changing under the Trump Administration, and whether these changed policies are proving effective in achieving the administration's immigration goals.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed this 22nd day of December, 2017 in Syracuse, New York.

_____
SUSAN B. LONG