UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SUSAN B. LONG and DAVID BURNHAM,

                              Plaintiffs,                    5:17-cv-506 (BKS/TWD)

v.

UNITED STATES IMMIGRATION AND CUSTOMS
ENFORCEMENT,

                              Defendant.
_____

**Appearances:**

*For Plaintiffs:*
Terence P. Keegan
Zachary M. Press
Miller Korzenik Sommers Rayman LLP
1501 Broadway, Suite 2015
New York, NY 10036

*For Defendant:*
Carla B. Freedman
United States Attorney
Ransom P. Reynolds, III
Assistant United States Attorney
100 South Clinton Street
Syracuse, NY 13261

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

**I.    INTRODUCTION**

      Plaintiffs Susan B. Long and David Burnham brought this action under 5 U.S.C. § 552(a)(4)(B) against Defendant United States Immigration and Customs Enforcement ("ICE") seeking to compel production of certain agency records pursuant to the Freedom of Information Act, 5 U.S.C. §§ 551–559 ("FOIA"). The Court denied the parties' initial cross-motions for

summary judgment on September 27, 2018. (Dkt. No. 32). On October 9, 2020, after further submissions and an evidentiary hearing held on August 15, 2019, (*see* Dkt. Nos. 58, 59, 66, 90–92), the Court denied ICE's renewed motion for summary judgment, (Dkt. No. 93). Presently before the Court are the parties' renewed cross-motions for summary judgment. (Dkt. Nos. 96, 116). Having carefully considered the parties' arguments and all of the submissions in this case, the Court grants ICE's motion for summary judgment and denies Plaintiffs' cross-motion.

## II.     BACKGROUND[1]

Plaintiffs are the co-founders and co-directors of the Transactional Records Access Clearinghouse ("TRAC"), a data gathering, data research, and data distribution center sponsored by the Whitman School of Management and the Newhouse School at Syracuse University. (Dkt. No. 116-4, ¶ 79). TRAC gathers a significant amount of immigration enforcement data from ICE through FOIA requests, and makes the information available to the public in online databases. (*Id.* ¶¶ 83–84). In the two FOIA requests at issue here, Plaintiffs seek information relating to ICE's "Form I-247 Requests" relating to detainers and notices of release. (*Id.* ¶¶ 83, 86; Dkt. No. 15-1, ¶¶ 12–14). Plaintiffs seek "person-by-person anonymous data" relating to individuals subject to ICE detainers and notices, including their demographic characteristics, immigration history, and criminal background. (Dkt. No. 1-1, at 1; Dkt. No. 1-5, at 1). Although Plaintiffs have been submitting FOIA requests for records concerning ICE's use of I-247 forms since 2011, Plaintiffs allege that from January 2017 onward, ICE has refused to provide "much of the information produced in its previous responses." (Dkt. No. 116-4, ¶¶ 83, 88). In response to the two FOIA requests at issue here, ICE produced some, but not all, of the data Plaintiffs sought.

---

[1] The Court assumes familiarity with the procedural and factual history of this case, as set out in the Court's September 27, 2018 and October 9, 2020 decisions. *See Long v. ICE*, No. 17-cv-506, 2018 WL 4642824, at *1–3, 2018 U.S. Dist. LEXIS 166170, at *1–10 (N.D.N.Y. Sept. 27, 2018); *Long v. ICE*, No. 17-cv-506, 2020 WL 5994182, at *1–7, 2020 U.S. Dist. LEXIS 187775, at *1–19 (N.D.N.Y. Oct. 9, 2020).

(*See* Dkt. No. 96-5, ¶¶ 43–54, 58–69). The data that ICE has not produced includes, inter alia, information about what happened following each detainer, including whether "the subject of a detainer was ever taken into ICE custody, whether that individual had ever been charged with or convicted of a crime, what any such offenses were, and whether the individual was deported." (Dkt. No. 25-1, ¶ 7).

### III.   STANDARD OF REVIEW

"FOIA cases are generally and most appropriately resolved on motions for summary judgment." *Families for Freedom v. U.S. Customs & Border Prot.*, 797 F. Supp. 2d 375, 385 (S.D.N.Y. 2011). To prevail on a motion for summary judgment, "the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA." *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994). A search is "adequate" when it is "reasonably calculated to uncover all relevant documents." *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). "'When a plaintiff questions the adequacy of the search an agency made in order to satisfy its FOIA request,' the key question is whether the search 'was reasonably calculated to discover the requested documents,' and not whether every document in existence was found by the search." *Thomas v. Soc. Sec. Admin.*, No. 11-cv-3698, 2013 WL 1873281, at *2–3, 2013 U.S. Dist. LEXIS 63750, at *8–9 (E.D.N.Y. May 2, 2013) (quoting *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 489 (2d Cir. 1999)), *aff'd*, 551 F. App'x 24 (2d Cir. 2014).

"In resolving summary judgment motions in a FOIA case, a district court proceeds primarily by affidavits in lieu of other documentary or testimonial evidence." *Long v. Office of Pers. Mgmt.*, 692 F.3d 185, 190 (2d Cir. 2012). To show that its search was adequate, an agency must provide "'a reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials [] were

searched.'" *Roman v. Dep't of the Air Force*, 952 F. Supp. 2d 166, 171 (D.D.C. 2013) (quoting *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 313–14 (D.C. Cir. 2003)). Affidavits or declarations "submitted by an agency are 'accorded a presumption of good faith,'" and factual discovery "relating to [an] agency's search . . . generally is unnecessary if the agency's submissions are adequate on their face." *Grand Cent. P'ship*, 166 F.3d at 488–89 (alteration in original) (quoting *Carney*, 19 F.3d at 812).

Once an agency has satisfied its burden, the affidavits "cannot be rebutted" by a plaintiff's "purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs., Inc. v. S.E.C.*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotation marks omitted). Rather, a plaintiff "must make a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations, or provide some tangible evidence that . . . summary judgment is otherwise inappropriate." *Carney*, 19 F.3d at 812 (internal citation omitted). Accordingly, summary judgment may only be granted in favor of the agency if the affidavits "contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record[,] or by evidence of agency bad faith." *Grand Cent. P'Ship*, 166 F.3d at 478 (quoting *Gallant v. NLRB*, 26 F.3d 168, 171 (D.C. Cir. 1994)).

IV.    ANALYSIS

    A.    **Adequacy of the Search**

In its October 9, 2020 decision denying ICE's renewed motion for summary judgment, the Court ruled that ICE had not met its burden of explaining why its search was adequate in light of the lack of factual development regarding ICE's capability of (1) searching the Enforcement Integrated Database ("EID") directly and (2) searching the ICE Integrated Decision Support System ("IIDS") "as a whole for responsive data at the outset," rather than "searching

4

for data within specific, pre-generated populations." *Long*, 2020 WL 5994182, at *9–11, 2020

U.S. Dist. LEXIS 187775, at *26–31.

The latest declaration of Patricia J. de Castro, an Operations Research Analyst within

Enforcement and Removal Operations ("ERO"), provides further explanation regarding how it is

that ICE can retrieve data from the EID through the EARM application, but not query the EID to

obtain the data sought by Plaintiffs. De Castro states that "EARM can only be used to query the

EID *one individual at a time*," that it is "primarily used by ICE officers in the field," and that it

requires the "manual entry of an identifier"—a process that would not be feasible for the requests

sought here. (Dkt. No. 96-2, ¶ 8). De Castro further states:

> It is not feasible for the agency to search the EID directly; the system was not designed to accommodate direct searches. I am unable to specifically explain in public why a direct search within the EID would compromise the EID and the agency's operations, but it would impact not only this agency, but other law enforcement entities who rely on EID access.

(*Id.*; *see id.* ¶ 8 n.1 (noting that, after the court's decision in *American Immigration Council v.

ICE*, 464 F. Supp. 3d 228 (D.D.C. 2020), "ICE notified Plaintiff that it had searched the EID to

determine if there was a unique numerical identifier . . . and [that] it did not locate any such

records"); *see also* Dkt. No. 123-1, ¶ 25 (declaration of Minnettia Durant stating: "The EID was

not designed as a reporting tool because it is a live, continuously updated database available to

thousands of ICE officers, and other law enforcement agencies, at any given time.")).[2]

While the assertions that it is not feasible for ICE to search the EID directly are

somewhat conclusory, the Court finds that the feasibility of directly searching the EID is not

determinative of the adequacy of ICE's search in this case. De Castro states that "[t]here is no

---

[2] Durant is a former Unit Chief of the Statistical Tracking Unit ("STU") in the Law Enforcement and Systems Analysis ("LESA") Division within ERO who has served as an ERO officer since April 2008. (Dkt. No. 123-1, ¶ 1).

5

data in the EID, not extracted or pulled into IIDS[,] that would be responsive to [P]laintiffs' requests." (Dkt. No. 96-2, ¶ 4; *see also* Dkt. No. 123-1, ¶ 25 ("IIDS was created so reporting could be conducted without impacting EID function. Records are pulled from EIDS into the IIDS, and the IIDS allows the agency to conduct reporting.")). "Any direct search of the EID—or the IIDS—would yield only the exact records that have already been produced." (Dkt. No. 96-2, ¶ 5). There is no record evidence before the Court contradicting the assertion that there is no data in the EID, which would be responsive to Plaintiffs' requests, that is not also in the IIDS. *See SafeCard Servs., Inc.*, 926 F.2d at 1200 (noting that an agency's affidavits "cannot be rebutted" by a plaintiff's "purely speculative claims about the existence and discoverability of other documents"). Accordingly, the failure to directly search the EID does not render ICE's search inadequate.

With regard to the IIDS, ICE has clarified that it is possible to search the IIDS directly. (*E.g.*, Dkt. No. 96-2, ¶ 5 (referencing "[a]ny direct search" of the IIDS)). Plaintiffs argue that ICE did not actually search the IIDS itself, but only searched the detainer population. (*See, e.g.*, Dkt. No. 116-5, at 11). Plaintiffs argue that ICE must search the IIDS directly for responsive data, rather than using "predefined" queries that result in "populations." (*See, e.g.*, Dkt. No. 116-1, ¶ 5 (citing testimony that a "population" is the result of "predefined queries" which are "generated weekly")). De Castro explains that "[p]opulations are simply data regarding law enforcement events, such as removals, arrests, and detainers" for a "certain time period." (Dkt. No. 96-2, ¶ 5).

However, de Castro states that, in preparing its responses to Plaintiffs' FOIA requests, ICE did in fact search the entire IIDS database. (*See id.* ¶ 7 (noting that "ICE analysts indeed queried the entirety of IIDS for the data requested" by Plaintiffs and "searched every location

6

where detainers data exist")). De Castro states that "ICE has not limited its search in any way" and that "[a]ny data [P]laintiffs request that exists in the IIDS *outside of the detainers population*, in any form, including in other populations, has been provided to the extent that it does not require the creation of records." (Dkt. No. 96-2, ¶¶ 5, 6 (emphasis added)). The Court credits de Castro's allegations regarding the data that exist in IIDS, where "detainers data exist," and the search conducted. Accordingly, whether ICE must search the IIDS for and produce all of the information Plaintiffs request raises the issue of whether such a search requires the creation of records, to which the Court turns next.

### B.      Creation of a Record

It is well-settled that FOIA "does not obligate agencies to create documents or retain documents; it only obligates them to provide access to those which it in fact has created and retained." *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 152 (1980); *see also Am. Civil Liberties Union v. Dep't of Justice*, 681 F.3d 61, 71 (2d Cir. 2012). In denying ICE's renewed motion for summary judgment, the Court did not decide whether "the process of linking disparate data populations in the IIDS constitutes the 'creation of a new record' within the meaning of FOIA." *Long*, 2020 WL 5994182, at *11–13, 2020 U.S. Dist. LEXIS 187775, at *31–39.

ICE argues that "Plaintiffs' FOIA requests are problematic inasmuch as they force ERO to search the IIDS in a person-centric view, when the database is not structured to perform searches in this manner." (Dkt. No. 96-1, at 10). Because the IIDS has an "event-based" database structure, providing the requested data "would require the creation of new, complex queries, and new records resulting from those newly created queries." (*Id.* at 13). In connection with its present motion for summary judgment, ICE provided the declaration of Donna Vassilio-Diaz, a Deputy Assistant Director of the LESA Division within ERO and former Unit Chief of the STU.

7

(Dkt. Nos. 96-3, 96-4).[3] Vassilio-Diaz acknowledges that while "detainer information, detention information[,] and apprehension information exist in various places in the EID and IIDS, ICE systems treat each of these types of events as distinct enforcement actions." (*Id.* ¶¶ 12–13). There is not necessarily a "direct relationship" between different enforcement actions, and for any individual "there are a number of identifiers, none of which is required every time an enforcement action is taken." (*Id.* ¶ 13).

Because ICE does not use a single unique identifier to track individuals across different enforcement actions, "multiple queries must be run to pull in a composite of certain identifiers for the individual and their detainers and book ins, before further analyses can occur." (*Id.* ¶ 15). Then, a "relationship must be established between the detainer records and book-in records based on the composite identifiers." (*Id.*). The results are then "consolidated" and the "new data set is used to perform the analyses and calculations to create" the information requested by Plaintiffs. (*Id.*). The "entire resulting data set is then validated by analysts and officers to determine the accuracy of this created relationship." (*Id.*). Vassilio-Diaz notes that the "new data set would be created specifically" to answer Plaintiffs' requests and would not be "a record which would have previously existed." (*Id.*; *see also* Dkt. No. 96-2, ¶¶ 6–7 (noting the "profound non-connect between law enforcement events in the database" and the lack of "one unique identifier that can link all the events")).

Plaintiffs argue that providing the information they seek does not require the creation of a record because it only requires ICE to conduct a search of an electronic database. (Dkt. No. 116-

---

[3] ICE requested an in camera review of the full, unredacted declaration of Vassilio-Diaz and its accompanying exhibit. (*See* Dkt. No. 97). Plaintiffs objected to an in camera submission. (Dkt. No. 101). The Court "decline[d] to consider" these materials in camera, finding that the "publicly-filed portions of Defendant's summary judgment submission (including the unredacted portions of the Declaration of Donna Vassilio-Diaz) provide sufficient information addressing the questions raised in the Court's October 2020 decision to allow the Court to render a decision" on ICE's most recent motion. (Dkt. No. 113 (internal citations omitted)).

8

5, at 14–21). Plaintiffs argue that the IIDS "is an *integrated* database, the structure of which includes built-in connections that allow different events and fields to be linked." (Dkt. No. 116-1, ¶ 15(a) (citing *Long v. ICE*, 464 F. Supp. 3d 409, 418–19 (D.D.C. 2020))). In her affidavit in support of Plaintiffs' cross-motion, Long points to the "IIDS Database Schema," which has arrows between tables, reflecting purported "linkages" between those tables in the database. (*Id.* ¶ 15; *see, e.g.*, Dkt. No. 116-2, at 86). Long contends that such "modern relational databases" do not require one unique identifier to associate individuals across events because "table-specific unique IDs" are "interlinked to one another." (Dkt. No. 116-1, ¶ 18). Plaintiffs argue that the IIDS Database Schema shows that the data they seek are linked together in ICE's databases such that ICE could simply write a query "using these built-in linkages" to compile the information. (*See* Dkt. No. 116-5, at 15–21).

ICE has responded to Plaintiffs' argument with an affidavit from Durant. (Dkt. No. 123-1, ¶¶ 26–27). Although Durant does not explain the arrows between tables depicted in the Database Schema, she denies that the requested data is linked in a way that would allow ICE to retrieve the records at issue, because the "databases are organized according to events," not to follow an individual. (*Id.* ¶ 27). Durant states that Long "has no understanding of the specifics of the ICE database, and has never seen EID nor IIDS, nor conducted a query using the database" and that "[t]here is no 'automatic' linkage between enforcement events that allows following an individual across immigration enforcement events." (*Id.* ¶ 33). The Court notes that Long has admitted, in cross-examination in the related lawsuit concerning removals, that she has not worked in the database from within ICE; rather, she is familiar with the commercial database management system used by ICE. (Dkt. No. 116-3, at 163–64). *See also Long*, 2021 WL 3931879, at *7, 2021 U.S. Dist. LEXIS 166545, at *23–24 (discounting Long's testimony

9

regarding "built-in cross-links" between tables in the IIDS where "she admitted that she had never directly worked with the IIDS or seen a query being run from within the database").

Having considered all of the evidence, the Court credits the declarations of the ICE officials who are engaged in ICE's data management and reporting, and the explanations of Vassilio-Diaz and Durant regarding the steps required to respond to Plaintiffs' requests. Those explanations are consistent with ICE's prior arguments and submissions in this case. (*See, e.g.*, Dkt. No. 80, at 17, 58–59 (Curtis Hemphill testifying that "there are so many identifiers in our database that are generated based on the encounters and the events and the different law enforcement actions," and that there is a risk of underreported data if only one identifier, such as a subject ID or a case ID or an "A number," is used to attempt to link the populations)).

According to Vassilio-Diaz, ICE must conduct analysis to match the identifiers across different enforcement events that correspond to the same individual. (*See* Dkt. No. 96-3, ¶¶ 12–15). More specifically, ICE must run "multiple queries" to create a "composite of certain identifiers for the individual," establish relationships based on the composite identifiers, consolidate the results, and perform "analyses and calculations" to create the information requested by Plaintiffs. (*Id.* ¶ 15). The "entire resulting data set" must then be "validated by analysts and officers." (*Id.*). Crediting that testimony, the Court finds that the process of linking disparate data populations in the IIDS to produce the information Plaintiffs request constitutes the "creation of a new record" within the meaning of FOIA. The parties agree that "sorting a pre-existing database of information to make information intelligible does not involve the creation of a new record," even where such a search "require[s] the application of codes or some form of programming to retrieve the information." *Long v. ICE*, No. 17-cv-1097, 2021 WL 3931879, at *4, 2021 U.S. Dist. LEXIS 166545, at *15 (D.D.C. Sept. 2, 2021) (citing *Nat'l Sec. Counselors*

10

*v. CIA*, 898 F. Supp. 2d 233, 270 (D.D.C. 2012)). Here, however, given the lack of common identifiers for individuals across enforcement events, the steps ICE must take to provide all of the information requested by Plaintiffs go beyond merely sorting, compiling, or extracting records that exist in the IIDS.[4] Vassilio-Diaz's declaration provides additional, non-conclusory detail about the steps required to respond to Plaintiffs' requests which allows the Court to conclude that, in this case, "the manipulation of data points in an electronic database through 'the application of codes or some form of programming' crosses the all-important line between searching a database, on the one hand, and either creating a record or conducting research in a database on the other." *Nat'l Sec. Counselors*, 898 F. Supp. 2d at 270–71.[5]

Similarly, in the related lawsuit concerning Plaintiffs' request for information related to "removals," the District Court for the District of Columbia found that providing the disputed information would require ICE to "do more than simply sort through information using preexisting connections" and to "create many of those connections in the first instance." *Long*, 2021 WL 3931879, at *4, 2021 U.S. Dist. LEXIS 166545, at *16. Because ICE would be required "to manufacture complex and often imprecise connections between otherwise facially unrelated data in the IIDS," the court found that production of the requested information went beyond merely sorting information or "writing new computer code to locate responsive records," but was instead "tantamount to the creation of new records." *Id.*, 2021 WL 3931879, at *5, 2021 U.S. Dist. LEXIS 166545, at *16–20.

---

[4] The parties' submissions do not raise a suggestion that any particular pieces of information Plaintiffs request could be obtained without facing the issue of a lack of a common identifier across enforcement events.

[5] The fact that ICE previously discretionarily prepared such records and provided them to Plaintiffs does not alter its obligations under FOIA. Moreover, FOIA does not require ICE to create and maintain randomized unique identification numbers for individuals. *Cf. Am. Civil Liberties Union Immigrants' Rights Project v. ICE*, No. 19-cv-7058, 2021 WL 918235, at *4–5, 2021 U.S. Dist. LEXIS 45109, at *10–17 (S.D.N.Y. Mar. 10, 2021) (finding that the replacement of alien numbers with unique IDs would entail the creation of a record).

Accordingly, because the Court finds that ICE has met its burden of showing that the search of the IIDS was adequate, and that taking the steps described by ICE to produce the data at issue would constitute the creation of new records,[6] the Court grants ICE's motion for summary judgment and denies Plaintiffs' cross-motion.

## V. CONCLUSION

For these reasons, it is hereby

**ORDERED** that ICE's motion for summary judgment (Dkt. No. 96) is **GRANTED**; and it is further

**ORDERED** that Plaintiffs' motion for summary judgment (Dkt. No. 116) is **DENIED**; and it is further

**ORDERED** that Plaintiffs' Complaint (Dkt. No. 1) is **DISMISSED** in its entirety; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Dated: March 9, 2022
Syracuse, New York

Brenda K. Sannes
U.S. District Judge

---

[6] In light of this holding, the Court need not address the parties' arguments regarding whether producing the data at issue would impose an undue burden on ICE.